Victor J. WERNIMONT and Florence A.
Wernimont, Plaintiffs-Appellants,

v.

INTERNATIONAL HARVESTOR CORP.,
and Midwestern Truck Sales, Co., a/k/a
Midwestern Truck Sales, Inc., Defend-
ants-Appellees.

No. 2–64035.

Court of Appeals of Iowa.

May 26, 1981.

Robert Kohorst and Fred Louis, Jr., of Louis, Moore, Kohorst & Louis, Harlan, for plaintiffs-appellants.

Emmet Tinley and Peter J. Peters of Stuart, Tinley, Peters, Thorn, Smits & Sens, Council Bluffs, for defendants-appellees.

Heard by OXBERGER, C. J., and DONIELSON, SNELL, CARTER and JOHNSON, JJ.

JOHNSON, Judge.

Plaintiffs, Victor J. and Florence A. Wernimont, appeal from judgment entered following a directed jury verdict for defendants, International Harvester Corp. and Midwestern Truck Sales, Inc., in an action to recover for personal injuries.[1] They claim that the trial court erred: 1) in finding insufficient evidence to warrant submission of the theories of negligence, strict liability and breach of implied warranties of merchantability and fitness for a particular use to the jury; 2) in imposing pretrial sanctions preventing plaintiffs from introducing expert testimony because of their failure to answer certain interrogatories propounded by defendants; 3) in excluding from evidence plaintiff's diary describing his injuries; and 4) in restricting plaintiffs' direct examination of one of defendant's engineers. We affirm.

On January 10, 1975, plaintiff was driving a cab-over truck tractor manufactured by defendant International Harvestor and retailed by defendant Midwestern Truck Sales. He was driving on Interstate 29 (South) near Council Bluffs when he lost

---

1. References to "plaintiff" in the singular are to Victor Wernimont; Florence's claim is for loss of consortium.

control of the vehicle because of blizzard and icy conditions. The truck broke through a steel barricade on the left side of the divided highway and crashed into the support beam of an overpass bridge used by traffic on Interstate 29 (North). The front of the cab caved in and the steering wheel pinned plaintiff to the seat, crushing his left side.

Plaintiffs filed their petition on January 10, 1977, seeking damages on four alternative theories: negligence, strict liability in tort and implied warranties of merchantability and fitness for a particular use. They alleged that defendants were negligent in five specific areas: 1) design and manufacture of the cab without adequate safety provisions for the driver; 2) design and manufacture of the cab without adequate structural strength; 3) failure to locate the steering column in a nonhazardous position; 4) failure to allow adequate room in the cab for the driver; and 5) failure to provide warnings regarding these allegedly dangerous conditions. Defendants answered plaintiffs' allegations with general denials and also alleged affirmative defenses of contributory negligence, assumption of risk, misuse, and act of God.

On January 28, 1977, defendants filed interrogatories which, among other things, asked plaintiffs to list the names of any experts they expected to call to testify on their behalf (interrogatory no. 32) and to specify with more particularity plaintiffs' theories of liability (interrogatories nos. 19–24). Due to plaintiffs' failure to respond to the interrogatories, defendants filed on June 29, 1977, a motion to compel discovery. On August 30, 1977, trial court ordered plaintiffs to answer within twenty days. Plaintiffs served answers on September 2, but did not answer interrogatories nos. 19–24 or 32. Plaintiffs' continuing failure to answer these interrogatories prompted a series of motions and resistances by both sides.

Following a pretrial conference on April 2, 1979, trial court issued an order requiring plaintiffs to provide by no later than April 12 a list of experts whose testimony they intended to elicit at trial. Plaintiffs did not file their response until April 16th. Defendants then filed a motion for an order imposing sanctions which trial court granted on June 20th. Pursuant to the order, plaintiffs' April 16th amendment to interrogatories was stricken and plaintiffs were "prohibited from the calling as an expert witness Patrick Miller or any other expert witness with respect to the issues of liability."

Trial to a jury began on July 24, 1979. At the close of plaintiffs' case, defendants moved for a directed verdict. Trial court sustained the motion on July 26th and entered judgment for defendants the following day. Plaintiffs' appeal followed.

**I. Scope of Review.** Since this appeal is at law, our review is on assigned error only. Iowa R.App.P. 4.

**II. Propriety of Motion for Directed Verdict.** Plaintiffs first argue that trial court erred in granting defendants' motion for a directed verdict because there is sufficient evidence in the record to justify submission of plaintiffs' various theories of liability to the jury. We note initially that such questions as negligence and proximate cause generally are to be decided by the jury; it is only in the exceptional cases that they may be decided as a matter of law. Iowa R.App.P. 14(f)(10). In determining the propriety of a motion for a directed verdict, we must view the evidence in the light most favorable to the party against whom the motion is made (here, plaintiffs). Iowa R.App.P. 14(f)(2).

We first must dispose of defendants' claim that the directed verdict was appropriate since plaintiffs presented no expert testimony in support of their claim of liability.

**A. Plaintiffs' Burden in Establishing a Prima Facie Case.** We begin our analysis by examining plaintiffs' burden in establishing a prima facie case. To prevail on a claim of strict liability in tort in Iowa, a plaintiff must establish the following elements:

(1) manufacture of a product by defendant; (2) the product was in a defective condition; (3) the defective condition was unreasonably dangerous to the user or consumer when used in a reasonably foreseeable use; (4) the manufacturer was engaged in the business of manufacturing such a product; (5) said product was expected to and did reach the user or consumer without substantial change in condition, i. e. the defect existed at the time of the sale; (6) said defect was the proximate cause of personal injuries or property damage suffered by the user or consumer; (7) damages suffered by the user or consumer.

*Osborn* [*v. Massey-Ferguson, Inc.*], 290 N.W.2d 893 at 901 (Iowa 1980); *see also Holmquist v. Volkswagen of America, Inc.*, 261 N.W.2d 516, 520 (Iowa Ct.App.1977).

The concept of strict liability also can be applied in the commercial context. Section 554.2314, The Code, establishes an implied warranty of merchantability for goods if the seller is a merchant as to such goods. One criterion for merchantability is that the goods "are fit for the ordinary purposes for which such goods are used." Section 554.-2314(2)(c). One scholar has noted that this requirement of merchantability as found in the Uniform Commercial Code imposes a strict liability standard on the merchant seller. "If he sells goods that are not merchantable, he is liable for breach of the implied warranty of merchantability regardless of whether he either knew or should have known of the deficiency in the goods." Phillips, "A Synopsis of the Developing Law of Products Liability," 28 *Drake Law Review* 317, 330 (1978–79).

Strict liability also may arise from a manufacturer's or supplier's breach of duty to warn consumers of the dangerous nature of goods sold. In *West v. Broderick & Bascom Rope Company*, 197 N.W.2d 202, 209 (Iowa 1972), the court quoted with approval from Restatement (Second) of Torts § 388 (1965):

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*See also Cooley v. Quick Supply Co.*, 221 N.W.2d 763, 770–72 (Iowa 1974).

■ When a design defect is alleged, plaintiff must show that the product is unreasonably dangerous because defendant failed to use reasonable care in its design. *Chown v. USM Corp.*, 297 N.W.2d 218, 220 (Iowa 1980). "Unreasonably dangerous" refers to "the consumer's reasonable expectations regarding the product's characteristics." *Eickelberg v. Deere & Co.*, 276 N.W.2d 442, 444 (Iowa 1979).

Another theory of design defect which has been accepted by various jurisdictions is the doctrine of crashworthiness, or liability imposed on manufacturers for defects which only enhance injuries rather than cause them.[2] Authorities which have carefully considered the issue have concluded that crashworthy or second collision cases, impugning product design, require, in addition to proof of product defect, three additional elements. These are: (1) proof of an alternative safer design, practicable under the circumstances; (2) what injuries would have resulted had the alternative safer design been used; and (3) the extent of enhanced injuries attributable to the defective

---

**2.** The Iowa Supreme Court has not yet discussed this issue. For an extensive treatment of this question, see *Huddell v. Levin*, 537 F.2d 726, 737–39 (3rd Cir. 1976); *Smith v. Ariens Co.*, 375 Mass. 620, 623–24, 377 N.E.2d 954, 956–57 (1978).

design. *E. g., Stonehocker v. General Motors Corp.*, 587 F.2d 151, 158 (4th Cir. 1978); *Huddell v. Levin*, 537 F.2d 726, 737–38 (3rd Cir. 1976); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 65, 577 P.2d 1322, 1326–27 (1978).

**B. Requirement of Expert Testimony.** Having discussed the applicable theories of recovery, we next must decide whether expert testimony was necessary to plaintiffs' proof. Initially, we note that Iowa law does not appear to require plaintiff to present expert testimony in all cases in order to prevail in a products liability action. In *Kleve v. General Motors Corp.*, 210 N.W.2d 568, 571 (Iowa 1973), the court stated: "Without question the burden was upon plaintiff to prove the Pontiac was defective when it left the seller's hands. Proof of such defect need not, however, necessarily rest upon direct evidence. It can be and is usually established by circumstantial evidence." *See also* Iowa R.App.P. 14(f)(16) ("Direct and circumstantial evidence are equally probative.") If an issue, however, is proven by circumstantial evidence, it (the evidence) must be sufficient to make the theory reasonably probable, and more probable than any other theory based on the evidence. *Osborn v. Massey-Ferguson, Inc.*, 290 N.W.2d 893, 901 (Iowa 1980). Whether expert testimony is required ultimately depends on whether it is a fact issue upon which the jury needs assistance to reach an intelligent or correct decision. *West v. Phillips*, 227 Iowa 612, 619, 288 N.W. 625, 628 (1939).

This issue was thoughtfully discussed in *Lynd v. Rockwell Manufacturing Co.*, 276 Or. 341, 349, 554 P.2d 1000, 1005 (1976):

> Admittedly, design defect cases sometimes involve technical, scientific issues which cannot be fully understood by the average juror without some expert assistance. In such cases, expert testimony as to the defective nature of defendant's design will be an indispensable element of plaintiff's case. However, when the issues presented relate to matters which require only common knowledge and experience to understand them, the testimony of experts is not essential.

*See also Smith v. Ariens*, 375 Mass. at 624–25, 377 N.E.2d at 957. In discussing the necessity of expert testimony on the issue of the existence and feasibility of alternative designs, the court in *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 69, 577 P.2d 1322, 1327 (1978), said that such issues "cannot be properly weighed solely on the basis of inference and common knowledge." The trial court must be "satisfied that there is evidence from which the jury could find the suggested alternatives are not only technically feasible but also practicable in terms of cost and the overall design and operation of the product." *Id.*

**C. Sufficiency of the Evidence.** In light of these principles, the question then is whether plaintiffs presented sufficient evidence, expert or nonexpert, direct or circumstantial, to warrant submission of their case to the jury on any theory of liability. Viewing the record in the light most favorable to them, the evidence shows that the motor in the vehicle driven by plaintiff at the time of the accident was located underneath the cab. In other models, the motor is out in front; the cab is set back. The cab construction and dimensions are such that the driver has little room for movement. The cab weighs approximately 600–700 pounds. The attached vehicle weighs 14,000–15,000 pounds and could be fully weighted to nearly 73,000 pounds. Robert McAfee, an engineer for defendant International Harvester, testified that the outermost aluminum shell covering the cab is .05 inch thick. The door is covered with steel which is .031 inch thick; the door itself is hollow. He also testified that the steering wheel is not collapsible and that his company never conducted any frontal-impact tests on this model. Plaintiffs' employer testified that warnings were neither placed on the cab nor provided by the retailer. No one explained to him how the cab was constructed.

Plaintiff himself testified that when he discovered that the surface of the highway was ice-covered, he immediately let up on the accelerator, but did not apply the

brakes. Since he was going up an incline at the time, he was slowing down. By the time he reached the guardrail on the side of the road, he thought that the rail would withstand the impact since he was travelling only five to ten miles per hour. Upon impact, however, the rail did not hold and he collided with the support beam of the overpass bridge. When that occurred, the corner of the cab caved in and crushed his left leg. The impact caused the steering wheel to come down, pinning him in the right groin area.

From this record, we conclude that plaintiffs have failed to offer proof on several elements essential to recovery. However, we begin with the obvious conclusion that in design cases involving sophisticated issues of technological possibility, a plaintiff cannot engender a jury issue as to negligence, product defect (as regards strict liability in tort), or product defect (as regards implied warranties of fitness or merchantability) simply with evidence describing the design of the product, photographic exhibits and models depicting what the product looked like, photographic exhibits and models showing that competitive lines of the same product are designed somewhat differently, and argument of counsel that the product is unreasonably dangerous. This is basically plaintiffs' entire case in the present action. The trial court, in granting the motion for directed verdict, took note of this fact and concluded:

> There is nothing in this record, whatsoever, which indicates in any degree that the design, the structural strength, location of any items, including the steering column would or could cause unreasonable risk to any operator of the vehicle.... [C]ounsel for plaintiffs has indicated that it is within the general knowledge of the general public that what has been shown

in this case as to the location of the steering column, for instance, or structure and its components, would be dangerous. The court would only observe that if it is a member of the "general public," it is not as well informed as other people.

We fully concur in this analysis and submit that a contrary conclusion would have permitted the jury in the present case to impose liability solely upon its personal whim and caprice.

Lack of proof of product defect, sufficient to support a claim in negligence, strict liability, or warranty, is not the only hurdle plaintiffs have failed to clear in seeking to generate a jury issue as to defendants' liability. Plaintiffs have fallen far short of offering the required proof as to additional elements (1) and (2) detailed above in our discussion of the theory of crashworthiness.[3] As to additional element one, the mere fact that defendants' truck tractor is designed with the cab over the engine which certain other models of truck tractors have the engine protruding outward in front of the cab, does not establish that one design is safer than other vis-a-vis the type of collisions reasonably to be anticipated in over-the-road driving. The record is noticeably lacking in any evidence of this type. The particular mishap in the present case borders on the bizarre in its manner of occurrence, especially with respect to the manner in which the cab of plaintiff's truck came into contact with a bridge support beam.

A manufacturer cannot design against all potential dangers of collision and is only required to take reasonable steps, within the limitations of cost, technology, and marketability, to design and produce a product that will minimize the unavoidable dangers. *Huddell v. Levin*, 537 F.2d at 735. Search of the record for evidence of an

---

**3.** Only the third of these additional elements has engendered much controversy in the cases, and it is not necessary to consider the third element in deciding the present case. Those who have criticized the third element stated above say that it departs from usual standards of proof in apportionment of damages among concurrent tortfeasors. *See* dissenting opinion

in *Huddell v. Levin* and *Fox v. Ford Motor Co.*, 575 F.2d 774, 787 (10th Cir. 1978). The proponents of the third element state that until that element has been established, there has been no actionable wrong established on the part of the products manufacturer which is a condition precedent to damage apportionment.

alternative safer design with respect to either (a) overall ability of the cab to withstand expected collisions or (b) the potential for injury to a driver on account of interior cab design reveals a total absence of satisfactory proof. Plaintiffs apparently recognize as much in their brief on appeal where they state:

> The problem, however, is deeper even than this. Realisticly, there seems to be a choice only between conventional cabs and cab-overs in the truck-tractor industry. The models available from different manufacturers are depressingly similar. This similarity does not offer the buyer a reasonable choice.... As we have seen in earlier arguments, there is no economic reason to provide any space of protection for the driver unless it is mandated by the courts. In short, the drivers of cab-over truck tractors are at the mercy of the manufacturers.

Plaintiffs thus seem to base their case on the contention that no over-the-road truck tractors on the market today are safe. We cannot accept such a proposition in the absence of proof.

Plaintiffs' failure of proof is even more dramatic with respect to the second additional element for recovery under crashworthiness. There is absolutely no evidence that any other practicable design would have better protected plaintiff against the consequences of the bizarre juxtaposition of his truck cab and a bridge support beam located far from the traveled portion of the roadway.

■ Lastly, because of plaintiffs' failure to establish the extent of the danger, if any, which was present from the alleged design defect, they are not entitled to recover on any theory of defendant's failure to adequately warn against such defect.

Thus, based on the evidence presented at trial, we find that trial court properly granted defendants' motion for directed verdict.

**III. Sanctions Prohibiting Plaintiffs' Use of Expert Witnesses.** Plaintiffs argue, however, that trial court's order of June 20, 1979, was erroneous and constituted an abuse of discretion. We note that the practical effect of this ruling was to foreclose plaintiffs from engendering a jury issue concerning defendants' liability. From our review of the record, we believe plaintiffs have failed to preserve this issue for review since they made no offer of proof as to the substance of any expert's testimony. Nonetheless, addressing the issue on the merits, we find no abuse of discretion in trial court's ruling.

■ We begin our analysis with Iowa R.Civ.P. 134(b)(2) which provides, in part, as follows:

> If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision "a" of this rule or rule 132, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> *  *  *  *  *  *
>
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence.

Imposition of such sanctions is vested in the discretion of trial court and we will not reverse such an order unless there has been an abuse of that discretion. *Sandhorst v. Mauk's Transfers, Inc.*, 252 N.W.2d 393, 399 (Iowa 1979). It is not necessary that a party's disobedience of discovery orders be willful in order to bring about sanctions. *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 14 (Iowa 1977).

■ After examination of the entire record, we cannot conclude that the June 20th order prohibiting plaintiffs from introducing expert testimony was an abuse of trial court's discretion. More than two years elapsed between defendants' initial service of the interrogatories on plaintiffs and the plaintiffs' answers to the question relating to the experts they intended to call as witnesses. Plaintiffs gave reasons for their inability to do so earlier; however, as *Haumersen* indicates, the fact that disobedi-

ence of discovery orders is not willful does not necessarily preclude sanctions as were imposed here. We find no basis for reversal on this issue.

Plaintiffs also claim that trial court erred in disallowing further direct examination of McAfee (defendant International Harvester's engineer) regarding possible consideration of alternative designs for the truck. After examining the challenged questions, we conclude that plaintiffs' attorney was attempting to elicit expert testimony from McAfee. Trial court disallowed the testimony because it would have violated the June 20th order. We find no abuse in trial court's ruling.

**IV. Admissibility of Plaintiff's Diary.** Plaintiff also argues that trial court erred in excluding from evidence a diary he compiled describing the progress of his injuries and recovery. Trial court sustained defendants' objections to admissibility of the diary on hearsay grounds. Plaintiffs claim on appeal that it was admissible under section 622.28, The Code 1979, the business records exception to the hearsay rule. We disagree.

One of the necessary elements of this exception is that the record was made in the regular course of business. *State v. Fisher*, 178 N.W.2d 380, 382 (Iowa 1970). Section 622.28 defines "business" as including "business, profession, occupation and calling of every kind." Plaintiff makes no assertion that the diary was written in the regular course of his business. We think it is clear, therefore, that the diary cannot be classified as a business record. Trial court properly disallowed it as evidence.

We have examined all of plaintiffs' other assignments of error and find them to be without merit. We thus affirm trial court's judgment.

AFFIRMED.