Jeffrey K. REED, Appellant,

v.

CHRYSLER CORPORATION, Appellee.

No. 91–423.

Supreme Court of Iowa.

Dec. 23, 1992.

Rehearing Denied Feb. 18, 1993.

Dan Fontaine of Onstad, Kaiser & Fontaine, Houston, TX, and Lance A. Grotewold of Heslinga, Heslinga, Dixon & Grotewold, Oskaloosa, for appellant.

Richard A. Stefani and Thomas F. Ochs of Gray, Stefani & Mitvalsky, Cedar Rapids, and Marc R. Brosseau and Suanne M. Dell of Weller, Friedrich, Ward & Andrew, Denver, CO, for appellee.

HARRIS, Justice.

Plaintiff Jeffrey K. Reed brought this suit against defendant Chrysler Corporation on a crashworthiness theory. At the close of Reed's case in chief, following five days of testimony, the trial court sustained Chrysler's motion for directed verdict. We reverse and remand.

The vehicle involved in this accident was a 1980 Jeep CJ–7, manufactured in 1979, which the driver purchased used in 1983. It came with two removable tops, a canvas top and a fiberglass top. Reed was a passenger.

Traveling east on highway 34, approximately two miles west of Albia, the Jeep's right side tires went off the road onto the gravel-surfaced shoulder as the Jeep approached a bridge. The Jeep turned sharply back onto the paved surface, missing the bridge wall on the Jeep's right side. It continued across both lanes of the highway, and at the far corner of the bridge the front left side of the vehicle slammed into the concrete bridge abutment. The force of the impact rapidly propelled the occupants, none of whom were wearing seat belts, out of their seats. Upon impact the driver's door either was forced open or was torn from the vehicle. The driver was ejected and struck a wooden support pole headfirst, dying instantly.

After the initial impact the vehicle, now driverless, began to ride up the concrete abutment to the bridge. It then continued

riding along the guardrail attached to the abutment. After leaving the guardrail the Jeep proceeded to roll onto its fiberglass top, breaking it. The overturned vehicle slid on its roll bar more than 300 feet farther down the road. It finally came to rest, still upside down. Reed, the right-rear passenger, was held inside the vehicle by his foot, which became entangled with the right front seat. As the vehicle slid upside down, Reed's right arm was momentarily pinched between the highway surface and the roll bar. The arm was severely fractured and is said to remain useless. Reed also fractured his right collarbone and dislocated his left hip. The other passengers received only minor injuries.

Accident investigators determined the vehicle had been speeding; one expert projected a speed of 79.47 miles per hour, another a speed in the low sixties. Blood tests showed the driver's alcoholic content at .185 grams of alcohol and Reed's at .168 (per 100 milliliters of blood).

■■■■ I. In Iowa the doctrine of crashworthiness was first recognized as a theory of design defect by the court of appeals in *Wernimont v. International Harvestor Corporation*, 309 N.W.2d 137 (Iowa App. 1981). The doctrine imposes liability on manufacturers for design defects which only enhance injuries rather than cause them. *Id.* at 140. The doctrine is applicable when a design defect, not causally connected to the accident, results in injuries greater than those which would have resulted from the accident had there been no design defect. In other words, enhancement of injuries is the gist of crashworthiness cases, not the precipitating cause of the accident.

At the time this case was tried, *Wernimont,* a court of appeals decision, was the only Iowa authority to recognize the crashworthiness doctrine. Since then we also recognized it. *Hillrichs v. Avco Corp.,* 478 N.W.2d 70 (Iowa 1991) (holding crashworthiness doctrine applicable where plaintiff was injured after becoming entangled in grain harvesting machinery designed and built without an accessible shut-off switch). We said:

The enhanced injury theory as applied to automobile manufacturers has been widely recognized. *See Tafoya v. Sears, Roebuck & Co.,* 884 F.2d 1330, 1337–38 (10th Cir.1989).

. . . .

We believe that the court of appeals' recognition of the enhanced injury doctrine in *Wernimont* was merely a correct application in a particular context of well-established elements of Iowa tort law that permit recovery of damages for injuries caused by the conduct of another that the law identifies as tortious. These principles mandate that an injured party's right of recovery extend to all injury or degree of injury that would have been prevented through the tortfeasor's exercise of the proper standard of care.

*Hillrichs,* 478 N.W.2d at 74–75.

■■■■ To prevail on a claim of crashworthiness a plaintiff at the threshold must establish the existence of a design defect. This showing must include proof that the product was unreasonably dangerous. *Wernimont,* 309 N.W.2d at 140 (citing *Chown v. USM Corp.,* 297 N.W.2d 218, 220 (Iowa 1980)). To prevail, after making the threshold showing, a plaintiff must then establish the following three elements:

(1) proof of an alternative safer design, practicable under the circumstances; (2) what injuries would have resulted had the alternative safer design been used; and (3) the extent of enhanced injuries attributable to the defective design.

*Wernimont,* 309 N.W.2d at 140–41.

II. In *Hillrichs* we did not consider whether expert testimony is required to establish the first element ("proof of an alternative safer design, practicable under the circumstances"). Hillrichs happened to present both expert and nonexpert testimony. *Wernimont* did discuss the issue, the court concluding that: "[w]hether expert testimony is required ultimately depends on whether it is a fact issue upon which the jury needs assistance to reach an intelligent or correct decision." *Wernimont,* 309 N.W.2d at 141. The *Wernimont* court explained that

design defect cases sometimes involve technical, scientific issues which cannot be fully understood by the average juror without some expert assistance. In such cases, expert testimony as to the defective nature of defendant's design will be an indispensable element of plaintiff's case. However, when the issues presented relate to matters which require only common knowledge and experience to understand them, the testimony of experts is not essential.

*Id.* (Quoting *Lynd v. Rockwell Mfg. Co.,* 276 Or. 341, 349, 554 P.2d 1000, 1005 (1976).)

In *Hillrichs* we did explore the second ("what injuries would have resulted had the alternative safer design been used") and third ("the extent of enhanced injuries attributable to the defective design") elements of the crashworthiness doctrine, and said how the two prongs are to be applied:

[R]ecovery should be denied when it is uncertain or speculative that any damage has actually occurred. Damages may be awarded, however, when the only dispute is the amount of damages and the evidence affords a reasonable basis for estimating the loss. In determining a just and reasonable estimate of damages based on relevant data, a jury may act on probable and inferential, as well as direct and positive proof.

*Hillrichs,* 478 N.W.2d at 75 (citations omitted). Thus, although the extent of the enhanced injury in *Hillrichs* was not definitively fixed, we said that "the degree of uncertainty [was not] so great as to preclude the jury from quantifying the enhanced loss with a reasonable margin of error." *Id.* at 75.

■ III. Reed's crashworthiness claim centers on two components of the Jeep CJ–7, its windshield frame and its removable hardtop. We can assume Reed developed

sufficient evidence regarding design defect.[1] If Reed has tendered sufficient proof on the three additional elements of crashworthiness, the case should have been submitted to the jury and directed verdict was improper. Reed believes it was neither the law nor the evidence which kept the case from the jury, but rather the trial judge's personal bias.[2]

The trial court's stated ground for sustaining the motion for directed verdict was a perceived lack of evidence of the first postthreshold element: "an alternative safer design, practicable under the circumstances." We of course view the evidence in the light most favorable to Reed. Iowa R.App.P. 14(f)(2). We think a jury question was made out on this element.

Company rollover test reports demonstrated that a removable steel top, sold in three versions by Chrysler as an option in at least one other Jeep model, may have prevented the injury to Reed's arm. Thus, the safer alternative introduced into evidence was familiar to Chrysler, indeed such an alternative had been designed, tested and sold for twenty years prior to the accident.

Reed's safety expert indicated that fiberglass tops shattered or came apart in most rollover accidents and thus were not crashworthy. Another expert said that fiberglass was a brittle material with little structural integrity and "not a material that you would use if you [were] interested in safety." Available metal tops, alone or in conjunction with struts between the windshield and rollbar, were much safer. This lent credence to Reed's insistence that safer alternatives were available to the manufacturer.

According to Reed's evidence, at the time of its manufacture, this Jeep CJ–7 was the only such model sold to the American pub-

---

1. There is no dispute that Reed presented sufficient evidence for jury submission of the threshold question (design defect).

2. In chambers, while considering the crashworthiness doctrine, the trial judge for some inexplicable reason made disparaging personal references to the former member of the court of appeals who authored the *Wernimont* decision.

For reasons we deem sufficient, those remarks will not be quoted here. It is enough for us to note that they went far beyond the sort of criticism that must be expected in our calling. We consider the judge's insulting remarks to be an affront to the entire judiciary and strongly condemn them.

lic still utilizing a fiberglass hardtop. The industry standard by 1980 was steel tops. The vehicle in which Reed was injured had the only plastic top sold in North America. This is significant because we have long recognized "custom and practice of the industry," as well as "state of the art," as a part of tort law. *Chown*, 297 N.W.2d at 222.

There is more evidence that Chrysler was aware of industry practice. The Jeep CJ–5, a shorter version of the CJ–7, had an optional steel top while the Jeep CJ–7 had only a fiberglass top. According to the manufacturer's 1980 accessories catalog, CJ–5 Jeep purchasers had the option of three metal tops. A Chrysler engineer acknowledged that the general public would perceive a metal top to be safer than a plastic top. Although the Jeep CJ–7 was not available to the general public with a metal top, this model, so equipped, was sold to the Alaskan post office.

We think a prima facie showing was made on the first element. We think this is true even in the absence of further expert testimony indicating whether an alternative safer design was practicable and feasible in terms of cost, economy of operation, maintenance requirements, and other safety factors. These questions were not so technologically sophisticated as to require expert testimony. The only difference in design between the fiberglass top and the metal top is the material involved. These matters were not beyond the understanding of an average juror.

IV. Although the trial court based its decision on the first post-threshold element of a crashworthiness claim, the case can be affirmed if Reed failed to produce sufficient evidence for a prima facie showing regarding the other two additional elements. The parties dispute the sufficiency of evidence on both the second and third elements: "(2) what injuries would have resulted had the alternative safer design been used; and (3) the extent of enhanced injuries attributable to the defective design."

A showing on these elements can be satisfied under the liberal requirements, previously mentioned, we established in *Hillrichs.* 478 N.W.2d at 75 (holding jury's just and reasonable estimate of damages may be based on relevant data derived from "probable and inferential, as well as direct and positive proof").

■ V. The present case differs from *Wernimont* where the alternative design would have lessened the injury. It is likely that a metal top would have changed the nature of Reed's injury, a matter that leads to more speculation. We nevertheless think a jury question was presented on the second element ("what injuries would have resulted had the alternative safer design been used"). Reed contends the "but for—causation" showing (but for the fiberglass top, his arm would not have been injured) is sufficient for this element. In other words, although Reed cannot show the injuries that would have occurred with a metal top, he contends he satisfied this element by showing the injury to his arm would not even have occurred with a metal top. We agree.

Chrysler also contends that Reed's inability to establish the precise injuries he would have suffered with a metal top is fatal to making a showing of the second element. We are not persuaded. The situation is akin to a general rule of damages. Where some damages appear, recovery should not be denied merely because of difficulty in fixing an exact amount. *Bangert v. Osceola County*, 456 N.W.2d 183, 190 (Iowa 1990).

Reed's expert testified that, had the Jeep been designed with a metal top, and had the top stayed attached, Reed would not have suffered his crushing arm injury. The arm injury is shown to be wholly attributable to the fiberglass top. Reed himself testified that $248,000 of the stipulated $258,000 in total damages is attributable to his arm injury. This evidence, taken together, made out a jury question on both the second and third elements.

VI. Even if our review of this case had led to an affirmance, a directed verdict would have been a very bad idea. This is because of what veteran Iowa judges often refer to as the Uhlenhopp rule. As a dis-

trict judge the Honorable Harvey Uhlenhopp, later a distinguished member of this court, faced a familiar situation. A defendant moved for a directed verdict which Judge Uhlenhopp overruled. A verdict was returned for the plaintiff, after which the defendant filed a motion for judgment notwithstanding the verdict on the same ground urged in the motion for directed verdict. Judge Uhlenhopp sustained the motion, saying:

> At the close of the evidence the court was clear that [the defendant was entitled to a judgment as a matter of law]. But to avoid the necessity of another trial in the event of error, although it seemed a nonsuit had to be, the case was submitted to the jury.

*Florke v. Peterson*, 245 Iowa 1031, 1033, 65 N.W.2d 372, 373 (1954). On appeal we said:

> We approve the trial court's procedure. A verdict for defendant might entirely avert appeal; and the verdict for plaintiff serves to avoid the necessity of retrial in the event of reversal. The procedure conforms to the spirit of rule ·243(b) [Iowa R.Civ.P.].... It is in line with the purpose of the legislation under which the rules were conceived—"promoting the speedy determination of litigation upon its merits."

*Id.* (Citations omitted.)

Justice Uhlenhopp's approach has been encouraged in many of our cases. Recently we said:

> [W]e note trial court acted appropriately when it allowed the case to go to the jury rather than [granting the] motion for a directed verdict. By allowing the case to go to the jury, trial court gave the jury an opportunity to consider the evidence, return a verdict, and potentially reach the same conclusion the court tentatively had reached. More importantly, this court, assuming no other prejudicial error is found, may now reinstate that verdict rather than being required to remand [the] claim for new trial.

*Johnson v. Junkmann*, 395 N.W.2d 862, 866 (Iowa 1986) (citations omitted).

■ We again emphasize that much is wasted by granting directed verdicts in routine cases, or in cases that are at all close. Considerable time and expense have usually been invested in the trial at that point. Submission to a jury is generally not far off. The so-called Uhlenhopp rule is decidedly in the public interest and should normally be followed.

■ VII. Because the question is likely to recur on retrial, we address Reed's claim for punitive damages. Because of the directed verdict, the appropriateness of this claim was not reached, although the trial court did offer its view that a claim for punitive damages was not made out.

■ On the basis of the showing made in this trial, we agree. Chrysler's conduct was not shown to be willful or wanton. In order to support such a claim, a plaintiff must show actual or legal malice. We reviewed the controlling principles in *Coster v. Crookham*, 468 N.W.2d 802, 810–11 (Iowa 1991).

■ VIII. Another issue apt to recur involved Reed's failure to use a seat belt. The court overruled Reed's motion in limine to exclude evidence of this failure. The motion should have been sustained. Iowa Code section 321.445(4)(a) (1991) provides:

> The nonuse of a safety belt or safety harness by a person is not admissible or material as evidence in a civil action brought for damages in a cause of action arising prior to July 1, 1986.

The accident occurred August 18, 1985, and is therefore subject to the quoted language.

Chrysler contends this prohibition is modified by language in Iowa Code section 321.445(4)(b). We think not. The legislature, for reasons it chose, enacted a flat prohibition of seat belt evidence in cases arising prior to the time seat belt use was required in Iowa. We are obliged to follow this clear mandate.

■ IX. Another issue almost certain to reappear on retrial concerns the admissibility of evidence of the driver's and Reed's

intoxication. Reed urges the trial court ruling, admitting this evidence, was error.

In former times comparative negligence was inapplicable to strict liability claims. *Speck v. Unit Handling Div., Litton Sys.*, 366 N.W.2d 543, 546 (Iowa 1985) (reaffirmed in *Duggan v. Hallmark Pool Mfg. Co., Inc.*, 398 N.W.2d 175, 180 (Iowa 1986)). This holding was consistent with the prevailing view. *See* Restatement (Second) of Torts §§ 402A, 524. Both *Speck* and *Duggan* were decided before the advent of our comparative fault Act[3] and were therefore not subject to its provisions.

This view of comparative negligence, as it relates to general strict liability claims, was undone by statute. Under the comparative fault Act, Iowa Code § 668.1(1), fault includes acts or omissions that subject a person to strict liability. A plaintiff's fault, under Iowa Code section 668.3, does not bar recovery; it serves only to diminish it. Iowa Code section 668.1(2) leaves intact existing "legal requirements of cause in fact and proximate cause."

X. The crashworthiness doctrine is a step removed from ordinary strict liability cases. The crashworthiness doctrine proceeds from the belief that a manufacturer has a duty to minimize the injurious effect of a crash, no matter how the crash is caused. *Larsen v. General Motors Corp.*, 391 F.2d 495, 502 (8th Cir.1968) (holding manufacturer liable for "so-called 'second collision' of the passenger with the interior part of the automobile" because accidents and enhanced injuries are foreseeable). *See* Harris, *Enhanced Injury Theory: An Analytic Framework*, 62 N.C.Law Rev. 643, 673–75 (1984).

The theory, which presupposes the occurrence of accidents precipitated for myriad reasons, focuses alone on the enhancement of resulting injuries. The rule does not pretend that the design defect had anything to do with causing the accident. It is enough if the design defect increased the damages. So any participation by the plaintiff in bringing the accident about is quite beside the point.

In adopting the crashworthiness doctrine in *Hillrichs*, we indicated a contrary view, stating that the plaintiff's comparative fault could be assessed against him in a claim for enhanced injuries. 478 N.W.2d at 76. On reconsideration, for the reasons just stated, we think a plaintiff's comparative fault should not be so assessed in a crashworthiness case unless it is shown to be a proximate cause of the *enhanced* injury.

Chrysler points to no way, and the record suggests none, in which the driver's or Reed's intoxication could bear on how Reed's injuries were enhanced by the construction of the Jeep's roof. Any negligence by Reed's driver, or even by Reed himself, in connection with the original crash cannot be used by the manufacturer in defending against Reed's enhancement claim. Evidence of intoxication should have been excluded.

Other arguments relate to issues either not preserved or not likely to recur on retrial.

REVERSED AND REMANDED.

All Justices concur except CARTER, J., and McGIVERIN, C.J., and SCHULTZ and SNELL, JJ., who concur in part and dissent in part.

CARTER, Justice (concurring in part and dissenting in part).

I concur in all of the majority opinion except the conclusions expressed in Division X, from which I dissent.

We recognized in *Hillrichs v. Avco Corp.*, 478 N.W.2d 70 (Iowa 1991):

[T]he enhanced injury doctrine [is] merely a correct application in a particular context of well-established elements of Iowa tort law that permit recovery of damages for injuries caused by the conduct of another that the law identifies as tortious. These principles mandate that

---

3. We adopted the comparative negligence doctrine in *Goetzman v. Wichern*, 327 N.W.2d 742, 754 (Iowa 1982). The comparative fault Act was adopted as Iowa Code chapter 668. 1984 Iowa Acts ch. 1293. It applies to all cases filed on or after July 1, 1984. 1984 Iowa Acts ch. 1293 § 15.

an injured party's right of recovery extend to all injury or degree of injury that would have been prevented through the tortfeasor's exercise of the proper standard of care.

*Id.* at 75. Actions seeking recovery for injuries caused by another's tort are triable in accordance with the comparative fault concepts embraced in Iowa Code chapter 668 if the theory of the tort involved constitutes fault as defined in Iowa Code section 668.1(1) (1991). The tort theories of strict liability and negligence involved in the present action fall within that definition. Iowa Code § 668.1(1).

In cases in which chapter 668 applies, the statutory requirement that fault is to be compared has reference to "fault resulting in death or in injury to person or property." Iowa Code § 668.3(1). These statutes further provide that "[t]he legal requirements of cause in fact and proximate cause apply both to fault as the basis for liability and to contributory fault." Iowa Code § 668.1(2). As a result of these statutes, the question of whether a claimant's fault may be considered in enhanced injury litigation depends on whether that fault is a proximate cause of the injuries for which the claimant is seeking to recover.

The rules that determine the causal relationship between a claimant's negligent conduct and the injury for which recovery is sought are the same as those that apply in determining the defendant's liability. Restatement (Second) of Torts § 465(2) (1965). Conduct that, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred, is a proximate cause of the event. *Nachazel v. Miraco Mfg.*, 432 N.W.2d 158, 160 (Iowa 1988); *Cronk v. Iowa Power & Light Co.*, 258 Iowa 603, 613, 138 N.W.2d 843, 848 (1965).

Negligent conduct of an actor, which only increases the foreseeable risk of harm produced by another person's negligence, is not an intervening cause unless it varies the risk in kind rather than degree. Restatement (Second) of Torts §§ 442A, 442B (1965). The situation presented in en-

hanced injury claims does not differ substantially from other situations in which the defendant's fault is premised on a failure to protect other persons from the consequences of their own negligent acts. Consequently, there is no logical reason to use different rules for fault comparison in enhanced injury claims than would be used in claims involving negligent failure to warn or negligent failure to install safety devices.

Because under settled principles of proximate cause a claimant's fault that produces an injury-producing occurrence will also be a proximate cause of the enhanced injuries sustained, the usual rules for fault comparison should apply to the enhanced injury portion of the claim. Our recognition of that proposition in *Hillrichs*, 478 N.W.2d at 76, should not be abandoned.

McGIVERIN, C.J., SCHULTZ and SNELL, JJ., join this concurrence in part and dissent in part.